**UNITED STATES of America,
Appellee,**

v.

**Reginald A. MORRISSEY, Appellant.**

**No. 627, Docket 71-2164.**

United States Court of Appeals,
Second Circuit.

Argued April 6, 1972.

Decided May 30, 1972.

Lawrence Stern, New York City (Jesse Berman, New York City, of counsel), for appellant.

Paul E. Warburgh, Jr., Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y. and David G. Trager, Asst. U. S. Atty., of counsel), for appellee.

Before CLARK, Associate Justice,* LUMBARD, Circuit Judge, and TYLER, District Judge.**

TYLER, District Judge:

Reginald A. Morrissey appeals from a judgment of conviction, following trial before a jury and Judge Rosling in the

---

* Retired Associate Justice of the Supreme Court, sitting by designation.

** District Judge for the Southern District of New York, sitting by designation.

Eastern District of New York, for robbing a federally insured bank in violation of 18 U.S.C. § 2113(a).

On July 17, 1970, Morrissey entered the Central Savings Bank in Brooklyn. Approaching a teller, Mrs. Joyce Payne, he presented her a note which said, "Don't make any noise. I have a gun pointed at your head. Hand over all your large bills in packs. Thank you." As Mrs. Payne began collecting the money, William Conlon, the bank manager, noticed her apparent agitation and the fact that she was placing bills in a canvas coin bag. Conlon immediately walked toward her teller's post and observed Morrissey as he came near. When Conlon was a few feet from Mrs. Payne, he saw the note passed to her by Morrissey and immediately activated the bank alarm and the surveillance cameras. Morrissey remained in the bank for about 30 seconds after the cameras began to take pictures and then fled with $12,300, leaving the note behind. During this period, three photographs of him were taken.

The police and the FBI arrived at the bank shortly after the holdup. The note was taken to police headquarters where a latent print, later proving to be that of Morrissey's right little finger, was lifted therefrom. The film from the surveillance cameras was developed, and the three photographs, later identified to be pictures of Morrissey, were produced.

Approximately two months after the robbery, the police came to the bank and showed Conlon six photographs, including one of Morrissey. Conlon identified the photograph of Morrissey to be a picture of the robber. Based on the foregoing information, a warrant for Morrissey's arrest was secured and, on February 10, 1971, Morrissey was arrested at his mother's house.

After the arrest, Morrissey was processed at the local police headquarters, where it was determined that he was a drug addict, and then taken to FBI headquarters in Manhattan. He was advised of his *Miranda* rights, but signed a waiver form and confessed to robbing the bank before FBI agents Campbell and Small. Campbell related the confession at the trial, the substance of which was that Morrissey and one "Jimmy", another drug addict, had determined to rob a bank to get money to pay for drugs. The Central Bank was selected because no guard was on duty. "Jimmy" prepared the note, and Morrissey went into the bank alone, as indicated above. After the robbery, the two men fled the area together.

In addition to the confession, the evidence against Morrissey at trial included the note with his fingerprint on it and in-court identification of Morrissey by Conlon and the three photographs taken by the camera in the bank. Morrissey introduced no evidence on his behalf.

Thus, as he surely was aware, the evidence of Morrissey's guilt was overwhelming.

Morrissey's principal contention on appeal is that his Sixth Amendment right to effective assistance of counsel was denied when the trial judge failed to investigate Morrissey's dissatisfactions with assigned counsel and subsequently ordered appellant to accept assigned counsel or to proceed *pro se*. After Morrissey's arrest, Edward Kelly of the Legal Aid Society was assigned to represent him, and he was formally arraigned on February 25, 1971. On April 2, 1971, the case was called and was adjourned until April 26, 1971 for trial. On April 26, the case was adjourned to May 10, and on that date it was adjourned for trial on 24 hours notice.[1] On September 2, 1971, the case was called and set for trial the next day.

Morrissey, who was in detention because of his inability to make bail, wrote Judge Rosling on April 26, 1971, requesting that new counsel be assigned and asking for a "complete psychiatric evaluation study." In support of his re-

---

1. There is no indication in the record of which party requested these adjournments or the reasons therefor.

quest for change of counsel, Morrissey stated that, "Mr. Kelly and I are unable to understand each other, and he, in my opinion, perhaps burdened by a high case load, does not want or is not able to effectively defend me." Morrissey also claimed that Kelly was unable or unwilling to do background research into his psychiatric background. The request for a study was based on allegations that Morrissey had been the subject of numerous psychiatric evaluations in the past and had undergone psychotherapy at the Brooklyn House of Detention in 1965. The record is barren of any action or answer by Judge Rosling to the foregoing letter; indeed, for ought that appears, the judge may never have received the letter. On May 10, 1971, Morrissey sent to the court a copy of another letter addressed to Edward Kelly authorizing him to be given access to any of defendant's psychiatric or medical records.

On September 3, 1971, the case was called for trial and the process of selecting jurors from a panel was begun. Morrissey interrupted the proceedings and renewed his request for change of counsel. He alleged that assigned counsel, Edward Kelly, had not met with him, thus depriving counsel and client of the opportunity to prepare a proper defense. More specifically, Morrissey asserted that Kelly failed to make important pre-trial motions,[2] exhibited little interest in the case and had not located or talked to alibi witnesses. Kelly, to the extent he was afforded time to do so, directly contradicted some of Morrissey's statements; he was not given time to answer all of defendant's claims, nor did the judge probe the issues very extensively. In any case, acquiescing to Morrissey's desires, Kelly did ask that he be relieved as counsel. Judge Rosling

denied the motion for change of counsel, apparently on the theory that it was a maneuver to delay the trial, a conclusion not entirely without support from the record as it then was known to the judge.[3] Offered a choice by the trial judge of representing himself with assigned counsel acting in an advisory capacity or continuing with assigned counsel, Morrissey chose the former.[4] The trial was adjourned with selection of the jury to continue on September 7, 1971 after the Labor Day recess.

On September 7, 1971, trial resumed, and Morrissey at once renewed his request for new counsel to be assigned and a continuance to effectuate the request. His allegations were substantially the same as on September 3, with the additions of his statement that "the last time I have seen Mr. Kelly was in April, I believe", and his allegation that counsel had failed to comply with a request to make an application for bail reduction. The motion was again denied. Morrissey also renewed his motion for a psychiatric examination, this time pursuant to a specific statutory section, 18 U.S.C. § 4244. In addition to alleging a psychiatric history which was enunciated in his letter to Judge Rosling of April 26, Morrissey stated that he had a history of narcotics addiction. The court was informed that efforts of Mr. Kelly to locate alleged psychiatric records at the Brooklyn House of Detention were unsuccessful because such records had been destroyed in the "riots" at that institution. The motion was denied, without prejudice to renewal if it should appear during the trial that Morrissey was not competent to assist in his own defense or understand the proceedings against him.

The original panel of jurors, including those jury members selected from the

---

2. Apparently, Morrissey was referring to the alleged failure of Kelly to proceed expeditiously with a motion for a hearing on the voluntariness of his confession subsequent to his arrest and, concomitantly, the failure to seek out specified witnesses for the hearing.

3. Morrissey never mentioned his April 26 letter to the court on September 3 or 7.

4. Judge Rosling made it clear throughout the trial that if Morrissey desired, he would allow Kelly to take over at any point in the proceedings.

panel on September 3, were dismissed. A new jury was impaneled, pre-trial suppression hearings were then conducted on September 7th and the morning of the 8th, out of hearing of the panel. Upon completion of those hearings, Judge Rosling ruled that defendant's confession was voluntary but reserved decision on the issue of bank manager Conlon's pre-arrest identification of Morrissey. As previously mentioned, the judge at trial did permit Conlon's evidence on this point. Trial began in earnest on the afternoon of the 8th, was then adjourned to September 13 and concluded on September 14.

Morrissey, who has a tenth grade education, represented himself in a credible fashion throughout the pre-trial hearings and the major portion of the trial. The trial judge questioned some witnesses in an attempt to get a complete picture of the relevant facts and made motions on behalf of Morrissey at the close of the government's case. Morrissey availed himself of Kelly's assistance approximately twelve times during the course of pre-trial hearings and the trial. Kelly was allowed by Morrissey to conduct the cross examination of one witness at the pre-trial hearing, and was consulted by the trial judge on procedural matters on several occasions during the trial-in-chief. Judge Rosling also inquired, out of the presence of the jury, as to the existence and extent of any Jencks Act material after each government witness testified. 18 U.S.C. § 3500. In the early going, Morrissey refused to specifically recognize Kelly as his counsel and stated that he would prefer new counsel to represent him. During the latter portion of the trial, Morrissey stood "mute", again expressed rejection of Kelly as counsel and refused to cross-examine government witnesses, present a defense in his own behalf or make a summation. He did, however, object to certain portions of the government summation. A guilty verdict was returned by the jury, and appellant was sentenced to ten years imprisonment.[5]

## I

 This court has made it abundantly clear that the right to counsel "cannot be . . . manipulated so as to obstruct the orderly procedure in the courts or to interfere with the fair administration of justice." United States v. Bentvena, 319 F.2d 916, 936 (2d Cir.), cert. denied, Ormento v. United States, 375 U.S. 940, 84 S.Ct. 345, 11 L.Ed.2d 271 (1963); United States v. Llanes, 374 F.2d 712 (2d Cir.), cert. denied, 388 U.S. 917, 87 S.Ct. 2132, 18 L.Ed.2d 1358 (1967). Unlike the circumstances in Bentvena and Llanes, here it cannot be said that Morrissey waited until the eve of trial to express dissatisfaction with counsel. Moreover, a timely adjournment to effectuate a change of counsel in this case might not have engendered as much delay as those adjournments already granted, none of which were attributable to appellant or Mr. Kelly as far as the record shows. The record also indicates that when Morrissey enunciated his reasons for change of counsel, the trial judge only made a perfunctory, surface inquiry to determine the truth and scope of his allegations. Morrissey's claims that counsel had not sought out an alibi witness who, if believed, would have been a complete defense to the indictment; had failed to meet with him during the five months before trial in an effort to prepare an adequate defense; and had failed to seek out witnesses for a post-trial hearing on the voluntariness of his confession were sufficiently serious on their face to require the judge to make a far more searching inquiry than he did on September 3 and 7.[6]

---

5. Appellant was assigned new counsel to represent him at sentencing. Appellant was represented on this appeal by still another assigned lawyer.

6. We emphasize that assigned trial counsel may have done much more for his client than the record shows. Morrissey's claims with regard to alibi witnesses

■ Without more, this failure to inquire, in our view, would constitute error sufficient for reversal of the judgment of conviction. The record, nevertheless, discloses that defendant's most serious contentions were either incorrect or cured by subsequent actions of the trial judge and Mr. Kelly. After the trial-in-chief was under way, Kelly, without contradiction by Morrissey, informed the judge that defendant did not wish to call any alibi witnesses. Earlier, during the pre-trial hearing on the issue of voluntariness, a specified witness whom Morrissey desired was secured on his behalf. During the Labor Day recess, before the jury was impaneled, Kelly went to see Morrissey to prepare his case; what they discussed and planned is, of course, not clear from the record, except that Kelly obtained the names of two potential witnesses. This case was relatively uncomplicated; thus the Labor Day recess almost certainly would have been ample for any serious preparation and conferences which had not taken place previously. In sum, the record as a whole indicates that Morrissey's reasons for a change of counsel were insubstantial. Thus, the trial court's proposed alternative to Morrissey of representing himself or continuing Kelly as counsel was proper. See United States v. Llanes, *supra;* United States ex rel. Jackson v. Follette, 425 F.2d 257 (2d Cir., 1970).

Morrissey also urges that to force a defendant to "undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict deprives him of the effective assistance of any counsel whatsoever." See Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir., 1970). Therefore, so the argument continues, to give Morrissey a

choice of representation by Kelly or appearing *pro se* was no real choice at all, but rather a deprivation of his Sixth Amendment right to counsel. We recognize from the history of this case from the date of Kelly's assignment to September 3 that Morrissey, not entirely without reason, acquired notions of dissatisfaction, distrust and concern in respect to Kelly's representation of him. This is one more reason why, in our view, it would have been appropriate for the trial judge to make more searching inquiries before the trial and motion hearings commenced. See Brown v. Craven, *supra.* The complete record, however, reveals that Morrissey conferred with Kelly a number of times in the course of the motion proceedings and trial, and that while the relationship may have remained somewhat strained —in part because of Morrissey's frivolous claim with regard to an alibi witness—there by no means existed an "irreconcilable conflict" which seriously impaired Kelly's usefulness as trial counsel.

## II

Appellant's next contention is that the trial court erred in failing to order a psychiatric examination under 18 U.S.C. § 4244.

■ The trial judge made a preliminary determination that Morrissey was able to understand the proceedings against him and assist in his own defense, and stated that he would entertain a renewal of this motion if his initial conclusion proved incorrect. In view of Morrissey's allegations of narcotics addiction and past psychiatric difficulties, it would have been the better course for the trial judge to have or-

---

proved frivolous. Many of Morrissey's allegations were partially contradicted by Kelly and, for all we can speculate, might have been fully contradicted had Kelly been given the opportunity to elaborate. To recognize fairness due to Mr. Kelly is not to deemphasize the main point: Serious allegations of an indigent defendant that appointed counsel is giving

inadequate representation should not be taken lightly. The courts cannot give with one hand an indigent defendant the right to appointed counsel and then, with the other hand, effectively take that right away by refusing to recognize the possibility that defendant's allegations of inadequate representation might prove correct after detailed inquiry.

dered a psychiatric examination. But the trial judge's determination that Morrissey was competent to stand trial was well supported by the latter's conduct at the pretrial proceedings, the suppression hearing, and the trial itself. The entire record shows that Morrissey, while representing himself, demonstrated beyond doubt that he was rational, intelligent and articulate—and thoroughly and explicitly understood the charges against him. Indeed, until he decided toward the end of trial to stand "mute", he conducted his defense in a competent manner for a layman. Judge Rosling, viewing the proceedings first hand, made similar comments throughout the trial. Accordingly, from the entire record, we find no reversible error in the trial court's denial, prior to trial, of Morrissey's application for psychiatric evaluation.

We have examined the other claims made by appellant and find them to be without merit. Judgment affirmed.